IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:15-CV-143-D

| | | |
|---|---|---|
| ADRIAN BERBER,<br>on behalf of himself and<br>all others similarly situated, | )<br>)<br>)<br>) | |
| Plaintiff, | )<br>) | |
| v. | )<br>) | **ORDER** |
| HUTCHISON TREE SERVICE,<br>NORTHSTAR ENERGY SERVICES, INC.,<br>PIEDMONT NATURAL GAS, INC.,<br>and CRAIG HUTCHISON, | )<br>)<br>)<br>)<br>) | |
| Defendants. | ) | |

On April 3, 2015, Adrian Berber ("Berber" or "plaintiff"), on behalf of himself and all others

similarly situated, filed a complaint against Hutchison Tree Service ("HTS"), Craig Hutchison

("Hutchison"), Northstar Energy Services, Inc. ("Northstar"), and Piedmont Natural Gas, Inc.

("Piedmont") (collectively "defendants") alleging violations of the Fair Labor Standards Act

("FLSA"), 29 U.S.C. §§ 201, et seq. and the North Carolina Wage and Hour Act ("NCWHA"), N.C.

Gen. Stat. §§ 95-25.1, et seq. On January 6, 2017, Berber moved for conditional class certification

and court-authorized notice concerning his FLSA claim and for class certification concerning his

NCWHA claim. See [D.E. 58, 59]. On February 13, 2017, Hutchison Tree Service and Craig

Hutchison responded [D.E. 64], and Northstar and Piedmont responded [D.E. 66]. On February 27,

2017, Berber replied [D.E. 71, 74]. On September 27, 2017, the court denied without prejudice

Berber's motion for conditional certification pursuant to the FLSA and for class certification

pursuant to Federal Rule of Civil Procedure 23 and directed the parties to engage in a court-hosted

settlement conference [D.E. 81]. On December 7, 2017, the parties participated in a court-hosted settlement conference with Magistrate Judge Gates. See [D.E. 88]. On April 4, 2018, Magistrate Judge Gates found that the parties reached an impasse in settlement negotiations [D.E. 90]. On April 5, 2018, Berber resubmitted the motion for conditional certification pursuant to the FLSA and for class certification pursuant to Federal Rule of Civil Procedure 23. As explained below, the court grants in part and denies in part Berber's motion.

I.

HTS is a Tennessee-based company that performs various tree services including cutting and clearing trees for pipeline right-of-ways. See Compl. [D.E. 1] ¶ 7; [D.E. 64] 8. Craig Hutchison is the owner and manager of HTS. See Compl. ¶ 8. The court will refer to HTS and Hutchison as the Hutchison defendants. Piedmont is a North Carolina corporation that provides natural gas to residential and business customers. See id. ¶ 9; [D.E. 66] 3. Northstar is a Texas corporation that provides infrastructure construction and support services to owners and builders of pipelines. See Compl. ¶ 11; [D.E. 66] 3. The Hutchison defendants hired Berber, and other putative class members, to cut and clear trees for a pipeline right-of-way that Piedmont was constructing across North Carolina (the "Integrity Project"). See Hutchison Decl. [D.E. 65] 1; cf. Compl. ¶¶ 5–6, 29. Berber alleges that the Hutchison defendants, Piedmont, and Northstar were his joint employers under 29 C.F.R. § 791.2. See Compl. ¶¶ 13, 18, 66.

In August 2009, Piedmont contracted with Northstar to perform various pipeline-related construction activities in connection with the Integrity Project. See Scott Rushing Decl. [D.E. 66-4] ¶ 7. Between 2012 and 2015, Piedmont, Northstar, and HTS entered into various contracts concerning work to be performed on the Integrity Project. See id. ¶ 6. Specifically, in July 2012, Northstar entered into a subcontract with HTS to provide tree services for the Integrity Project

2

because Northstar could not access portions of the pipeline right-of-way that were overgrown with trees and shrubs. See id. ¶¶ 8–9. The subcontract required HTS to work as an independent contractor and to be responsible for all terms and conditions of its employees' work. See id. ¶ 10; Subcontract Agreement [D.E. 67-2] 7–8. In October 2013, Piedmont entered into a direct agreement with HTS for tree-clearing services on the pipeline right-of-way to avoid markup costs from HTS working as a subcontractor for Northstar. See Jim Kalish Decl. [D.E. 66-1] ¶ 9; [D.E. 67-1]. The contract provided that HTS would perform services as an independent contractor and that HTS would be solely responsible for the terms and conditions of its employees' work. See Kalish Decl. ¶ 9; [D.E. 67-1] 17. In turn, in August 2014, NorthStar entered into a subcontract with HTS to perform cleaning work on the pipeline right-of-way. See Rushing Decl. ¶ 15.

In November 2013, the Hutchison defendants hired Berber to work on the Integrity Project and offered to pay him $700 per week. See Compl. ¶ 29. Berber alleges that defendants had a common policy and practice of requiring employees to arrive at Hutchison's yard before the start of each work day, load equipment onto company vehicles, travel to jobsites, and return to the yard at the end of the day to unload equipment. See id. ¶¶ 32–34. Under defendants' alleged common policy and practice, employees were not compensated for these pre- and post-shift activities or travel time. See [D.E. 59] 2. Specifically, Berber and other similarly situated employees would arrive at HTS's yard at approximately 5:00 a.m. at the start of the workday. See Compl. ¶ 32. The employees would then load HTS's machinery and equipment into trailers. See id. Once the trailers were loaded, employees would travel to an in-state jobsite using HTS's vehicles and work at the jobsite from approximately 7:00 a.m. until 5:30 p.m. See id. ¶¶ 33, 35. At the end of the day, employees would return to HTS's yard and unload the equipment, tools, and materials that were used at the jobsite. See id. ¶ 34. Berber and other similarly situated employees were paid a salary and required

3

to work a minimum of 55 hours each week, but the salary did not include time spent loading and unloading equipment and traveling to and from jobsites. See id. ¶¶ 35, 41–43; [D.E. 59] 8, 10–11. Defendants maintained payroll records but the records did not include the time that putative class members' spent performing pre- and post-shift activities and traveling to jobsites. See Compl. ¶ 43. Moreover, when a class member had to leave a jobsite early or arrive late, HTS would deduct the missing hours from their wages. See id. ¶ 41.

On April 3, 2015, Berber sued defendants claiming that defendants violated section 207 of the FLSA by not compensating class members for hours worked in excess of forty hours in a workweek at a rate of not less than one and one-half times their hourly rate. See Compl. ¶ 65. Berber also brought a claim under the NCWHA claiming that defendants failed to pay class members all accrued wages. Berber now seeks conditional certification of his FLSA claim and class certification under Federal Rule of Civil Procedure 23 of his NCWHA claim.

## II.

The FLSA requires employers to pay non-exempt employees a minimum wage and overtime wage. See 29 U.S.C. §§ 206-07; Desmond v. PNGI Charles Town Gaming, LLC, 630 F.3d 351, 356–57 (4th Cir. 2011); Romero v. H.B. Auto. Grp., Inc., No. 11 Civ. 386(CM), 2012 WL 1514810, at *5–7 (S.D.N.Y. May 1, 2012) (unpublished). Under the FLSA, employees can bring suit, on behalf of themselves and other similarly situated employees, against employers for unpaid overtime and other claims. See 29 U.S.C. § 216(b). This collective action process enables similarly situated employees to pool resources and promote judicial efficiency. See, e.g., Jackson v. Bloomberg, L.P., 298 F.R.D. 152, 158 (S.D.N.Y. 2014); Faust v. Comcast Cable Commc'ns Mgmt. LLC, No. WMN–10–2336, 2011 WL 5244421, at *2 (D. Md. Nov. 1, 2011) (unpublished). The FLSA is a special form of collective action, separate from class actions under Rule 23 of the Federal Rules of

4

Civil Procedure. See 29 U.S.C. § 216(b). Unlike class actions under Rule 23(b)(3), in which class members are bound by the judgment unless they opt out of the class, collective FLSA actions require plaintiffs to give "consent in writing to become such a party." Id. Thus, FLSA collective-action plaintiffs must be "similarly situated" and opt in to the class by filing consent with the court. See Sandoval-Zelaya v. A+ Tires, Brakes, Lubes, & Mufflers, Inc., No. 5:13-CV-810, 2017 WL 4322404, at *4 (E.D.N.C. Sept. 28, 2017) (unpublished); Rosinbaum v. Flowers Foods, Inc., 238 F. Supp. 3d 738, 743 (E.D.N.C. 2017); Jackson, 298 F.R.D. at 158.

Courts generally follow a two-stage process in determining whether to grant certification for a collective action under section 216(b). See, e.g., Sandoval-Zelaya, 2017 WL 4322404, at *5; Rosinbaum, 238 F. Supp. 3d at 743; Faust, 2011 WL 5244421, at *2; Williams v. XE Servs., LLC, No. 2:09–CV–59–D, 2011 WL 52353, at *2 (E.D.N.C. Jan. 4, 2011) (unpublished). "In the first stage, sometimes referred to as the 'notice stage,' the court makes a threshold determination of whether the plaintiffs have demonstrated that potential class members are 'similarly situated,' such that court-facilitated notice to the putative class members would be appropriate." Faust, 2011 WL 5244421, at *2 (quotation omitted); see Sandoval-Zelaya, 2017 WL 4322404, at *5; Rosinbaum, 238 F. Supp. 3d at 743; McLaurin v. Prestage Foods, Inc., 271 F.R.D. 465, 469 (E.D.N.C. 2010); Parker v. Smithfield Packing Co., No. 7:07-CV-176-H, 2010 WL 11565605, at *3 (E.D.N.C. Aug. 23, 2010) (unpublished), report and recommendation adopted by 2010 WL 11565686 (E.D.N.C. Sept. 27, 2010) (unpublished). The second stage generally occurs after discovery and requires the court to engage in a fact-intensive inquiry to determine whether the putative class is "similarly situated" and whether certification is appropriate. See, e.g., Sandoval-Zelaya, 2017 WL 4322404, at *5; Faust, 2011 WL 5244421, at *2. The defendant typically initiates the second stage by moving for "decertification" of the class. See, e.g., Faust, 2011 WL 5244421, at *2.

The notice stage does not require a demanding evidentiary showing, but instead requires only "substantial allegations that the putative class members were together the victims of a single decision, policy, or plan." McLaurin, 271 F.R.D. at 469; see Sandoval-Zelaya, 2017 WL 4322404, at *4–5; Rosinbaum, 238 F. Supp. 3d at 743; Faust, 2011 WL 5244421, at *2. This standard is considerably less stringent than the standards for class certification under Federal Rule of Civil Procedure 23. See, e.g., Jackson, 298 F.R.D. at 158. Plaintiffs may satisfy this requirement by relying on pleadings, affidavits, and declarations. See, e.g., id.; Romero, 2012 WL 1514810, at *9; XE Servs., 2011 WL 52353, at *3. "[P]laintiffs must submit evidence establishing at least a colorable basis for their claim that a class of 'similarly situated' plaintiffs exist." Faust, 2011 WL 5244421, at *2 (quotation omitted); see XE Servs., 2011 WL 52353, at *3; Purdham v. Fairfax Cty. Pub. Sch., 629 F. Supp. 2d 544, 548–49 (E.D. Va. 2009).

A.

The Hutchison defendants do not oppose conditional class certification under section 216(b), subject to Berber refining the class definition and notice. See [D.E. 64] 1–2.[1] The court finds that

---

[1] Berber's proposed class definition is

> Individuals who performed work on Piedmont's gas pipelines and right-of-way throughout, at a minimum, various parts of North Carolina, whose duties included, but were not limited to, tree pruning, tree removal, tree trimming, land clearing, and stump grinding for Hutchison Tree Service, Craig Hutchison, Northstar Energy Services, Inc., and Piedmont Natural Gas, Inc., (collectively "Defendants") whom named Plaintiff alleges jointly employed him and all of those similarly situated employees, whom paid named Plaintiff and all similarly situated employees as lump-sum or hourly paid laborers, and whom were suffered or permitted to work while not being paid their appropriate regular-rate, straight-time, promised rate(s), and overtime compensation for all hours worked, at any time from April 3, 2012, until the termination of the contract, or until approximately January, 2015.

[D.E. 59] 2.

Berber has made a sufficient factual showing that the Hutchison defendants subjected putative class members to a common policy that violated the FLSA. See, e.g., Ferebee v. Excel Staffing Serv., Inc., No. 2:16-CV-8-BO, 2017 WL 1416533, at *3 (E.D.N.C. Apr. 19, 2017) (unpublished); Zelaya v. A+ Tires, Brakes, Lubes, & Mufflers, Inc., No. 5:13–CV–810–F, 2015 WL 5703569, at *3 (E.D.N.C. Sept. 28, 2015) (unpublished). Berber and other putative class members submitted declarations stating that they were not paid for any pre- or post-shift activities or travel time or paid overtime for hours worked in excess of forty hours. Moreover, Berber and putative class members raise similar legal issues as to the nonpayment of overtime wages arising from a similar factual setting. See, e.g., Ferebee, 2017 WL 1416533, at *3. Accordingly, Berber has satisfied the requirements for conditional class certification under the FLSA against HTS and Hutchison.

B.

Northstar and Piedmont oppose Berber's motion for conditional certification under section 216(b). See [D.E. 66]. Northstar and Piedmont contend that Berber has failed to show that they had any involvement in the alleged common practice or policy that resulted in the underpayment of wages. See id. at 2, 10–12. Furthermore, Northstar and Piedmont argue that they cannot be considered joint employers because the Hutchison defendants were solely responsible for all the terms and conditions of class members' employment. See id. at 8–10. Thus, according to Northstar and Piedmont, Berber has failed to sustain his burden of showing that class certification is appropriate and that notice should be issued.

The court agrees with Northstar and Piedmont. First, Berber's pleadings and affidavits do not plausibly suggest that he will be able to prove that Northstar and Piedmont were joint employers. Cf. Jackson v. Fed. Nat'l Mortg. Ass'n, 181 F. Supp. 3d 1044, 1054 (N.D. Ga. 2016) (applying joint employer doctrine under the FLSA). Second, Berber's pleadings and affidavits do not set forth a

minimal factual showing that Northstar and Piedmont employed a common practice or policy that violated the FLSA.

Typically courts consider the joint employment doctrine at the decertification or the summary judgment stage. See Jackson, 181 F. Supp. 3d at 1053; Nadreau v. Lush Cosmetics, LLC, No. 2:10–CV–298–FtM–36SPC, 2011 WL 13143146, at *3 (M.D. Fla. Jan. 28, 2011) (unpublished); McKnight v. D. Houston, Inc., 756 F. Supp. 2d 794, 806 (S.D. Tex. 2010). Nonetheless, Berber must offer at least some factual support to show that Northstar and Piedmont were putative class members' joint employers and that Northstar and Piedmont had a common policy that resulted in the underpayment of wages. See, e.g., Glatt v. Fox Searchlight Pictures, Inc., 811 F.3d 528, 540 (2d Cir. 2015); Korenblum v. Citigroup, Inc., 195 F. Supp. 3d 475, 483 (S.D.N.Y. 2016).

Under the FLSA, separate entities that share control over an individual worker may be deemed joint employers. See, e.g., Schultz v. Capital Int'l Sec., 466 F.3d 298, 304–05 (4th Cir. 2006); Luna-Reyes v. RFI Constr., LLC, 109 F. Supp. 3d 744, 749 (M.D.N.C. 2015); 29 C.F.R. § 791.2(a). Joint employment exists when "(1) two or more persons or entities share, agree to allocate responsibility for, or otherwise codetermine the essential terms and conditions of a worker's employment and (2) the worker is an 'employee' within the meaning of the FLSA." Salinas v. Commercial Interiors, Inc., 848 F.3d 125, 140 n.8 (4th Cir. 2017). Step one of the analysis focuses on whether two or more entities are "not completely disassociated." Id. at 141–42; 29 C.F.R. § 791.2(a). In making this determination, courts may consider six non-exhaustive factors:

> 1) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to direct, control, or supervise the worker, whether by direct or indirect means;
> (2) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to—directly or indirectly—hire or fire the worker or modify the terms or conditions of the worker's employment;
> (3) The degree of permanency and duration of the relationship between the putative

joint employers;

(4) Whether, through shared management or a direct or indirect ownership interest, one putative joint employer controls, is controlled by, or is under common control with the other putative joint employer;

(5) Whether the work is performed on a premises owned or controlled by one or more of the putative joint employers, independently or in connection with one another; and

(6) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate responsibility over functions ordinarily carried out by an employer, such as handling payroll; providing workers' compensation insurance; paying payroll taxes; or providing the facilities, equipment, tools, or materials necessary to complete the work.

Salinas, 848 F.3d at 141–42. No factor is dispositive, and one factor alone may be sufficient to find either for or against a joint employment relationship. See id.

Berber's allegations and the affidavits and evidentiary materials he submitted do not plausibly suggest that Northstar and Piedmont were joint employers. Berber conclusorily alleges that class members worked for the Hutchison defendants, Piedmont, and Northstar, and that the Hutchison defendants, Piedmont, and Northstar were joint employers under 29 C.F.R. § 791.2. See Compl. ¶¶ 6, 18, 20. Berber also alleges that (1) the Hutchison defendants, Piedmont, and Northstar had supervising authority over putative class members, (2) putative class members "worked at various locations throughout North Carolina, exclusively on property owned by Defendant Piedmont, under exclusive contract with Defendants Hutchison and Northstar, and under the regular or daily supervision of managers of all Defendants, including Piedmont," (3) Piedmont's and Northstar's supervisors gave work orders to putative class members, (4) Piedmont's and Northstar's inspectors signed putative class members' daily timesheets and maintained payroll records, and (5) Piedmont and Northstar did not "ensure that [HTS] was paying their shared employees in compliance with the law." See id. ¶¶ 31, 35, 39–40, 45. Affidavits of Berber and other opt-in plaintiffs similarly conclusorily allege that they worked for the Hutchison defendants, Northstar, and Piedmont and that defendants had a practice of not compensating employees for required pre- and post-shift activities

9

and travel time. See Adrian Berber Decl. [D.E. 59-4] ¶¶ 1, 6, 16; Juan Jose Sanches Decl. [D.E. 59-5] ¶¶ 1, 6, 16; Dereck Sandoval Decl. [D.E. 59-6] ¶¶ 1, 6, 16; Adolfo Reyes Martinez Decl. [D.E. 59-6] ¶¶ 1, 7, 18; Heriberto Hernadez Decl. [D.E. 59-8] ¶¶ 1, 7, 15; Oscar Niubo Decl. [D.E. 59-9] ¶¶ 1, 7, 17; Juan Guadarrama Decl. [D.E. 59-10] ¶¶ 1, 7, 16; Jorge Galvan Garcia Decl. [D.E. 59-11] ¶¶ 1, 7, 15; Jorge Teron Garcia [D.E. 59-12] ¶¶ 1, 7, 15; Jose Angel Rodriguez Decl. [D.E. 59-12] ¶¶ 1, 7, 15; Joel Rivera Decl. [D.E. 59-14] ¶¶ 1, 7, 16; Hector Ivan Santiago Lugo Decl. [D.E. 59-15] ¶¶ 1, 7, 15; Jose Andrade Decl. [D.E. 59-16] ¶¶ 1, 7, 15.

Most of Berber's allegations speak to factors one and five. As for the allegation that Northstar's and Piedmont's supervisors gave work orders to putative class members, "an entity does not become a joint employer by engaging in the oversight necessary to ensure that a contractor's services meet contractual standards of quality and timeliness." Salinas, 848 F.3d at 148; see Harris v. Med. Transp. Mgmt., 300 F. Supp. 3d 234, 244 (D.D.C. 2018). In Salinas, the putative joint employer, Commercial, engaged in extensive daily oversight of plaintiffs' work including (1) providing specific instructions concerning how to complete projects, (2) frequently requiring plaintiffs to redo work, (3) telling certain plaintiffs to work additional hours, and (4) directing plaintiffs to say they work for Commercial and to wear Commercial branded clothing. See Salinas, 848 F.3d at 146, 148; Young v. Act Fast Delivery of W. Va., Inc., No. 5:16-cv-09788, 2018 WL 279996, at *7 (S.D. W. Va. Jan. 3, 2018) (unpublished). Berber's allegations concerning Northstar's and Piedmont's oversight do not approach the extensive supervision found in Salinas. Berber's allegations that Northstar and Piedmont directed putative class members by telling class members what areas needed work and inspecting the work product comports with ensuring HTS's compliance with contractual standards. As for factor five, although putative class members may have worked on Piedmont's property, tree removal always will be performed at a third-party site. Thus, these

factors do not support Berber's joint employer theory.

As for the remaining factors, Berber does not allege that Northstar and Piedmont had any direct or indirect authority to hire and fire putative class members or to modify the terms and conditions of their employment. To the contrary, Berber states that the Hutchison defendants hired him and the Hutchison defendants set his salary. See Compl. ¶ 29. The Hutchison defendants would also adjust Berber's and class members' salaries if they arrived late or left early. See id. ¶ 41. As for factors three and four, Berber does not allege that HTS, Northstar, and Piedmont shared any management or direct or indirect ownership structure between themselves. As for factor six, although Berber alleges that Piedmont maintained payroll records and signed timesheets, he does not allege that Piedmont had any responsibility concerning his or any putative class members' payroll, workers' compensation, or insurance. Moreover, Berber does not allege that Piedmont and Northstar provided necessary equipment or materials for the job. To the contrary, Berber states that the Hutchison defendants supplied all the specialized equipment to perform the work, and that employees would travel to jobsites from HTS's yard using HTS's vehicles. See id. ¶¶ 32, 34–35. Accordingly, Berber's allegations do not plausibly suggest that he will be able to show that Northstar and Piedmont were joint employers with HTS.

Alternatively, even if the court reserved its joint-employment analysis for a later stage, Berber's motion for conditional class certification as to Northstar and Piedmont would still fail. Berber has not made an adequate factual showing to support an inference that Northstar and Piedmont had a uniform policy or practice that violated the FLSA. Although Berber repeatedly uses the term "defendants," the pleadings and affidavits demonstrate that the Hutchison defendants were solely responsible for any alleged unlawful policy. Specifically, Berber alleges that he and other similarly situated employees reported to HTS's yard at approximately 5:00 a.m. where employees

11

would load equipment and machinery into trailers before traveling to the jobsite. See Compl. ¶ 32. HTS supplied employees with all necessary equipment. See id. ¶ 34. Employees traveled to jobsites using HTS's vehicles. See id. ¶ 35. HTS required Berber and other employees to load and drive HTS's vehicles and to transport co-workers from HTS's yard to jobsites. See id. ¶ 36. At the end of the day, employees would return to HTS's yard to unload equipment. See id. ¶¶ 33–34.

The Hutchison defendants hired Berber and offered to pay him a salary of $700 per week. See id. ¶ 29. The Hutchison defendants also paid his other employees a salary and would deduct from this salary when the employee had to leave the jobsite early or arrive late. See id. ¶ 41. The Hutchison defendants

> never paid overtime for hours worked over 40 per week despite being fully aware of the hours worked by [p]laintiff and the putative class members . . . Hutchison [d]efendants and Piedmont maintained payroll records which contain . . . hours of work for work performed at the jobsite only. Such records, however, do not include [p]laintiffs' and the putative class members' pre- and post-shift activities for loading, unloading and travel time to and from the jobsite which was part of the continuous workday.

Id. ¶¶ 42–43. Moreover, Berber alleges that Hutchison told Berber and other similarly situated employees that he did not pay overtime compensation and that if the employees did not like this policy they could leave. See id. ¶ 44. Other than conclusorily alleging that Northstar and Piedmont maintained payroll records and were aware of the Hutchison defendants' policies, see id. ¶¶ 43, 45, Berber fails to offer any factual support to show that Northstar and Piedmont maintained the same alleged policy or encouraged the Hutchison defendants' alleged policy. See, e.g., Heuberger v. Smith, No. 3:16-CV-386-JD-JEM, 2017 WL 3923271, at *12 (N.D. Ind. Sept. 7, 2017) (unpublished); Korenblum, 195 F. Supp. 3d at 483 ("Plaintiffs present no evidence at all that the thirty-eight vendors shared a common plan or policy not to compensate IT workers for nonbillable hours."); Bouthner v. Cleveland Constr., Inc., No. RDB–11–0244, 2012 WL 738578, at *5 (D. Md.

12

Mar. 5, 2012) (unpublished); cf. Jackson, 181 F. Supp. 3d at 1056–57.[2] Accordingly, Berber's motion for conditional certification as to Northstar and Piedmont is denied.

III.

Berber also seeks class certification under Federal Rule of Civil Procedure 23 for his claim under the NCWHA. Berber alleges that defendants willfully refused to pay all earned and accrued wages, including overtime wages. See Compl. ¶¶ 75–83. Hutchison, HTS, Northstar, and Piedmont each oppose class certification.

The standard required to meet the certification requirements of Federal Rule of Civil Procedure 23 is more stringent than the standard for conditional certification under the FLSA. See Callari v. Blackman Plumbing Supply, Inc., 307 F.R.D. 67, 74 (E.D.N.Y. 2015); Thompson v. Bruister & Assocs., Inc., 967 F. Supp. 2d 1204, 1217 (M.D. Tenn. 2013); XE Servs., 2011 WL 52353, at *2 n.2. Indeed, when examining a motion for class certification under Rule 23, the court may consider the merits of plaintiff's underlying claim to the extent such inquiry informs whether the Rule 23 prerequisites are satisfied. See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 465–66 (2013); Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 351–52 (2011).

Under Federal Rule of Civil Procedure 23(a), class certification is appropriate if "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Once the plaintiff has satisfied the Rule 23(a)

_____

[2] Despite repeatedly using the word "defendants," without specifying which defendants, Berber's affidavits do not provide any additional factual support to show that Northstar and Piedmont maintained an unlawful policy. See, e.g., Adrian Berber Decl. [D.E. 59-4] ¶¶ 4–20; Juan Jose Sanchez Decl. [D.E. 59-5] ¶¶ 4–20.

13

prerequisites, plaintiff must show that "class certification is proper under one of the subdivisions of Rule 23(b)." McLaurin, 271 F.R.D. at 475; see Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614 (1997). Berber seeks to certify a Rule 23(b)(3) class. Rule 23(b)(3) allows a class action to be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Once a plaintiff satisfies the requirements of Rule 23(a), the plaintiff must satisfy the two components of Rule 23(b)(3): predominance and superiority. See Thorn v. Jefferson-Pilot Life Ins. Co., 445 F.3d 311, 319 (4th Cir. 2006).

As for numerosity, "[t]here is no mechanical test for determining whether in a particular case the requirement of numerosity has been satisfied." Kelley v. Norfolk & W. Ry., 584 F.2d 34, 35 (4th Cir. 1978) (per curiam). "The issue is one primarily for the District Court, to be resolved in light of the facts and circumstances of the particular case." Id.; see Holsey v. Armour & Co., 743 F.2d 199, 217 (4th Cir. 1984). Here, there are at least 100 putative class members. Accordingly, the numerosity element is satisfied. See, e.g., McLaurin, 271 F.R.D. at 475.

As for the second and third Rule 23(a) factors, "[t]he requirements for typicality and commonality often merge." Romero v. Mountaire Farms, Inc., 796 F. Supp. 2d 700, 714 (E.D.N.C. 2011); see Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157 n.13 (1982); Kidwell v. Transp. Commc'ns Int'l Union, 946 F.2d 283, 305 (4th Cir. 1991). Under the "commonality" requirement of Rule 23(a)(2), at least one common question of law or fact must exist among class members. See EQT Prod. Co. v. Adair, 764 F.3d 347, 360 (4th Cir. 2014); Brown v. Nucor Corp., 576 F.3d 149, 153 (4th Cir. 2009); Haywood v. Barnes, 109 F.R.D. 568, 577 (E.D.N.C. 1986). What matters to class certification, however, "is not the raising of common 'questions'—even in droves—but, rather

14

the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." Wal-Mart Stores, Inc., 564 U.S. at 350 (quotation and emphasis omitted). The typicality requirement is met if "the claims of the representative parties [are] typical of the claims of the class." Haywood, 109 F.R.D. at 578; see Soutter v. Equifax Info. Servs., LLC, 498 F. App'x 260, 264–65 (4th Cir. 2012) (unpublished); Deiter v. Microsoft Corp., 436 F.3d 461, 466 (4th Cir. 2006). A claim is typical if it "arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." Beattie v. CenturyTel, Inc., 511 F.3d 554, 561 (6th Cir. 2007); see Romero, 796 F. Supp. 2d at 714. The typicality requirement is "captured by the notion that as goes the claim of the named plaintiff, so go the claims of the class." Deiter, 436 F.3d at 466 (quotation omitted); see Soutter, 498 F. App'x at 264–65; Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 340 (4th Cir. 1998).

As for the Hutchison defendants, they argue that the commonality and typicality elements are not satisfied because HTS had agreements with certain employees not to compensate them for travel time between jobsites. See [D.E. 64] 13–14. Thus, according to the Hutchison defendants, the court would need to engage in a individualized inquiry to determine whether class members were entitled to be paid for travel time under the NCWHA. See id. at 15. The court rejects the argument. The class members' claims arise from the same policies and course of conduct, namely the Hutchison defendants' policy of not compensating employees for pre- and post-shift activities and travel time between jobsites. Moreover, Berber's and putative class members' claims are based on the same legal theory, a violation of N.C. Gen. Stat. § 95-25.6. See Velasquez-Monterrosa v. Mi Casita Rests., No. 5:14-CV-448-BO, 2016 WL 1703351, at *5 (E.D.N.C. Apr. 26, 2016) (unpublished); Romero, 796 F. Supp. 2d at 714; McLaurin, 271 F.R.D. at 476. Accordingly, these requirements are

15

satisfied. See, e.g., Beattie, 511 F.3d at 561–62.

As for defendants Northstar and Piedmont, Berber cannot satisfy the commonality requirement. As discussed, Berber has failed to show that Northstar and Piedmont had a common policy that resulted in putative class members not being paid overtime. See Wal-Mart Stores, 564 U.S. at 359 ("Because respondents provide no convincing proof of a companywide discriminatory pay and promotion policy, we have concluded that they have not established the existence of any common question."); Miller v. ThedaCare, Inc., No. 15–C–506, 2018 WL 472818, at *5 (E.D. Wis. Jan. 18, 2018) (unpublished); In re AutoZone, Inc., 289 F.R.D. 526, 542 (N.D. Cal. 2012). Berber has also failed to plausibly allege that Northstar and Piedmont were his joint employers. Thus, there is no common evidence or means of proof that could establish Northstar's and Piedmont's liability on a class-wide basis. Accordingly, Berber's motion for class certification as to Northstar and Piedmont is denied.

As for the fourth requirement, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." Amchem, 521 U.S. at 625–26 (alteration and quotation omitted); see In re Red Hat, Inc. Sec. Litig., 261 F.R.D. 83, 87 (E.D.N.C. 2009). The adequacy inquiry also "serves to uncover conflicts of interest between named parties and the class they seek to represent." Amchem, 521 U.S. at 625; see Beattie, 511 F.3d at 562. A conflict must be considered "fundamental" to defeat the adequacy requirement. See Dewey v. Volkswagen Aktiengesellschaft, 681 F.3d 170, 184 (3d Cir. 2012); Ward v. Dixie Nat'l Life Ins. Co., 595 F.3d 164, 180 (4th Cir. 2010); Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 430–31 (4th Cir. 2003). "A conflict is not fundamental when . . . class members share common objectives and the same factual and legal positions and have the same interest in establishing the liability of defendants." Ward, 595 F.3d at 180 (quotation and alteration omitted); see Gunnells, 348 F.3d at 430–31.

16

Moreover, in assessing the representative's adequacy, courts may consider several factors including "honesty, conscientiousness, and other affirmative personal qualities." Shiring v. Tier Techs., Inc., 244 F.R.D. 307, 315 (E.D. Va. 2007); see In re Red Hat, 261 F.R.D. at 87. Here, there are no conflicts between Berber and the other putative class members, and Berber has the same interest as the other putative class members in recovering uncompensated overtime hours. See, e.g., Romero, 796 F. Supp. 2d at 715. Moreover, Berber has "pursue[d] a resolution of the controversy in the interests of the class." Dura-Bilt Corp. v. Chase Manhattan Corp., 89 F.R.D. 87, 101 (S.D.N.Y. 1981); see Berry v. Schulman, 807 F.3d 600, 613–14 (4th Cir. 2015).

As for predominance, the predominance requirement is "far more demanding than Rule 23(a)'s commonality requirement and tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Gariety v. Grant Thornton, LLP, 368 F.3d 356, 362 (4th Cir. 2004) (quotation omitted); see Amchem, 521 U.S. at 623–24; Gray v. Hearst Commc'ns, 444 F. App'x 698, 700–01 (4th Cir. 2011) (unpublished); Thorn, 445 F.3d at 319. The predominance inquiry focuses on the balance between individual issues and common issues. See Brown v. Nucor Corp., 785 F.3d 895, 917–21 (4th Cir. 2015); Myers v. Hertz Corp., 624 F.3d 537, 549 (2d Cir. 2010).

Common issues of law and fact have been held to predominate "where the same evidence would resolve the question of liability for all class members." Beaulieu v. EQ Indus. Servs., Inc., No. 5:06–CV–00400–BR, 2009 WL 2208131, at *20 (E.D.N.C. July 22, 2009) (unpublished); see Stillmock v. Weis Mkts., Inc., 385 F. App'x 267, 273 (4th Cir. 2010) (unpublished); Gunnells, 348 F.3d at 428; Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 40 (1st Cir. 2003). The predominance inquiry focuses on whether "common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." Tyson

17

Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1045 (2016) (quotation omitted). Individualized damages alone do not defeat predominance. See, e.g., Brown v. Electrolux Home Prods., Inc., 817 F.3d 1225, 1232, 1239 (11th Cir. 2016); Gunnells, 348 F.3d at 427–28; Smilow, 323 F.3d at 40; Hart v. Louisiana-Pac. Corp., No. 2:08-CV-47-BO, 2013 WL 12143171, at *2 (E.D.N.C. Mar. 29, 2013) (unpublished). Rather, a class may be certified under Rule 23(b)(3) "even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." Tyson Foods, Inc., 136 S. Ct. at 1045 (quotation omitted); see Crutchfield v. Sewerage & Water Bd. of New Orleans, 829 F.3d 370, 376 (5th Cir. 2016).

Berber argues that he satisfies the predominance requirement because defendants had a "uniform policy or practice to fail to compensate employees for all of their accrued wages, including straight and overtime wages, by, in part, compensating [e]mployees only for hours worked at the assigned jobsites, and failing [to] compensate for pre- and post-shift activities and travel time." [D.E. 59] 34. Berber contends that the only individualized issues relate to damages. Id. In opposition, the Hutchison defendants argue that individual questions predominate because some employees voluntarily traveled between the yard and a jobsite to perform preliminary and postliminary activities such as loading tools and equipment. See [D.E. 64] 17. Because only required preliminary and postliminary activities are compensable, the court would need to assess individually each employee to determine whether the time they spent loading and unloading equipment and traveling was compensable. See id.

Generally, when a plaintiff challenges his employer's policy concerning overtime pay, "the validity of that policy predominates over individual issues and class certification is appropriate." Dorman v. DHL Express (USA), Inc., No. 09-cv-99-bbc, 2010 WL 446071, at *3 (W.D. Wis. Feb. 3, 2010) (unpublished); see, e.g., Rossini v. Ogilvy & Mather, Inc., 798 F.2d 590, 598–99 (2d Cir.

1986); Ramirez v. Riverbay Corp., 39 F. Supp. 3d 354, 368–69 (S.D.N.Y. 2014). Here, the court finds that the Hutchison defendants' alleged policy of not compensating employees for overtime hours, including hours spent performing pre- and post-shift activities, predominates. See, e.g., Kurgan v. Chiro One Wellness Ctrs. LLC, No. 10–cv–1899, 2014 WL 642092, at *9 (N.D. Ill. Feb. 19, 2014) (unpublished) ("Where, as here, the focus is on liability-imposing conduct of the defendant that is identical as to all putative plaintiffs, the predominance element is satisfied."). Although the Hutchison defendants argue that there are individual questions, such as whether the employee voluntarily traveled between the yard and a jobsite, such individual questions go to damages and do not predominate over the common issues, such as whether the Hutchison defendants' failure to pay employees for pre- and post-shift activities violated N.C. Gen. Stat. § 95-25.6. See, e.g., Schilling v. PGA Inc., 293 F. Supp. 3d 832, 840–41 (W.D. Wisc. 2018) ("[Q]uestions concerning damages for individual class members, such as the number of hours each employee worked, do not predominate over the common contention regarding whether the two challenged policies for calculating overtime pay are unlawful.") (emphasis omitted); Iglesias-Mendoza v. La Belle Farm, Inc., 239 F.R.D. 363, 373 (S.D.N.Y. 2007). Moreover, Berber does not need to prove that every member of the putative class was harmed before a class can be certified. See, e.g., Bell v. PNC Bank Nat'l Ass'n, 800 F.3d 360, 380 (7th Cir. 2015). Furthermore, even if separate proceedings were needed to determine which class members were adversely affected, the issue of liability can be determined by class-wide proceedings. See id.

As for the superiority requirement, plaintiffs must be able to demonstrate that proceeding as a class "is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); see Thorn, 445 F.3d at 319. In assessing superiority, courts should consider the following factors:

19

(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3); see Thorn, 445 F.3d at 319. Courts should consider "whether Rule 23 is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court." Stillmock, 385 F. App'x at 274 (quotation omitted).

The superiority requirement is met. As for the first factor, the burden and expense of individual litigation, and the legal and practical difficulty of proving individual claims concerning these events, make it unlikely that individual class members could obtain the relief sought if they were forced to proceed on their own. As for the second factor, no individual claims are pending. As for the third factor, this court presents a desirable forum for litigating these claims. The claims arose in the Eastern District of North Carolina and many of the relevant records are in the Eastern District of North Carolina. See, e.g., Zelaya, 2015 WL 5703569, at *5; Iglesias-Mendoza, 239 F.R.D. at 373. Therefore, the court grants Berber's motion for class certification concerning the NCWHA claim.

IV.

In sum, the court GRANTS in part and DENIES in part plaintiff's motion [D.E. 58] for conditional class certification and court-authorized notice concerning plaintiff's FLSA claim and for class certification concerning his NCWHA claim. The Hutchison defendants and plaintiff shall meet and confer concerning future proceedings, the contents of the proposed notice, and the class definition and submit a proposed schedule no later than August 31, 2018. Defendants Northstar Energy Services, Inc. and Piedmont Natural Gas, Inc. are DISMISSED as defendants.

SO ORDERED. This 14 day of August 2018.

Dever

JAMES C. DEVER III
Chief United States District Judge

21